Thank you, Your Honor. May it please the Court. Really this case... Your name for the record? I'm sorry about that. Gennady Lebedev on behalf of the appellants. This appeal really boils down to maybe three or four main issues. The first issue is what was the standard that the Court was required to follow with regard to analyzing these offers, these rights of first refusal? And the Court indicated that the standard was not whether the offers were reasonable, that reasonableness was not the standard. And I'm arguing that it is, that it is one of the standards. The second question is whether the ROFRs that were given to the dealers in this particular case, whether those ROFRs were identical to... ROFR being jargon for right of first refusal? Correct. I apologize. We've been using that interchangeably, ongoingly. But yes, ROFR, R-O-F-R, right of first refusal. So the question is, are the ROFRs, are the rights of first refusal truly a right of first refusal? Are they identical to the offers that were made by the third parties, between Equilon and the third parties? And the third question is really having to do whether the underlying case is a frivolous case, which is what the lower court found in awarding expert fees. And I believe that there's really no way that anyone can say that this was a frivolous case given all of the law and argument that's been presented. If I can just move directly to the point that concerns me in terms of what you're arguing, the leaseback agreement with respect to Armis Walker, can you tell me in not just words, in formal terms, but in real substantive economic terms, how is the offer given to the third party different from the offer given to Armis Walker? The leaseback, what the leaseback does is a third party who is making a bid on a real estate, that's a gas station, knows ahead of time that the Petroleum Practices Marketing Act, the PMPA, creates certain rights in the dealer and that there are certain timelines that are in place. And the way the PMPA works is that a dealer who is subject to the PMPA may never be terminated unless there's certain causes that are specifically enumerated in the PMPA that allow for that termination. So if I'm a third party making a bid on this property, I know ahead of time that I'm going to have to sit back and wait until the dealer's initial franchise agreement expires. Because one of the grounds for non-renewal or termination is the oil company deciding to sell the property, which is what the case was here, they decided to sell the property. Problem is they can't throw the dealer out until the franchise agreement expires. So if I'm a third party, I know I have to wait for that franchise agreement to expire. So if there's, let's say, six months left on that agreement, I know that when I'm making a bid, I am not going to take possession of that property right away. I'm going to have to wait. And that bidder knows ahead of time when he's making that bid that, according to the lease-back agreement within the lease, that he's going to get some money back for that six months that he's waiting, which is sort of like a pass-through of the rent that the dealer is paying. So when the third party is making that bid, he knows that I'm making my bid today for $1 million, for example, and I'm not going to take possession for six months. And during that six months, I'm going to recoup a certain amount of money in rent. And I can take that into account and figure that into the bid that I'm making. The dealer receives the bid and is required to accept it within a certain specific period of time, within a 45-day period. And once he accepts it, he then has to take possession of the property. And according to the papers that were presented to the dealers, they were supposed to sign a mutual termination agreement, which would essentially end that franchise relationship prematurely, before the six months are up or whatever amount of time is left on the lease. So the dealer is not going to benefit in the same way that the third party is going to benefit by having to wait. But if I understand it correctly, what the dealer is going to get, not the third party, what the dealer is going to get is the property itself. Correct. He becomes the owner in fee simple of the property. Correct. Which means that the pass-through that would go to the other guy because he is the owner but he can't occupy is irrelevant to him because he is now the owner and he occupies. So I've come back to my question. What in substantive economic terms is the difference between the offer given to the third party with the lease back and the offer given to the franchisee who comes into this as a fee simple owner and doesn't need, in a sense, he would be paying himself? Right. So what's the difference in real economic terms? Well, the dealer would be not receiving the rent that the third party would be receiving but is paying the same price that the third party is paying minus that rent that the third party is already counting on to receive that. But who would the third party be receiving the rent from?  The dealer is paying Shell Oil Company the rent that's in their contract and Shell Oil Company would be reimbursing that rent to the third party. But he's getting the value of the property because he owns it. Sure. But, again, we're looking at is the ROFR the same for the dealer as it is for the third party? And I argue that it's not. You see, that's exactly my question. I understand that the terms are different because the third party and the franchisee are in different positions. The third party has to wait to take possession of the property he owns. The franchisee does not. And it seems to me that the leaseback provision is designed to accommodate that. It's designed to accommodate that. But the other way to accommodate that was to provide the same option to the dealer. In other words, instead of requiring the dealer... So the same option to the dealer would have been move out. You can't have possession but we'll give you the rent. No, the option to the dealer, the way this was structured, was to give a mutual termination agreement to the dealer to require him to end that lease early. The other way of doing it, what they should have done and the way they've done it in the past, was instead of requiring that the dealer terminate their franchise prematurely, continue on with that franchise relationship, the dealer would pay that rent and get the rent back. Now the difference there is that Shell would continue to be responsible for the environmentals at the station during the entire time of the franchise relationship for the remaining period of time and would continue to maintain the property and the equipment there for the duration of the franchise. By requiring the dealer to sign the mutual termination, Shell is getting out of their obligations under the franchise agreement early and prematurely. And so that's ultimately the practical difference by not giving the dealer the same lease back option that the third party got. So if the dealer closes escrow now, the dealer will lease back the property to Shell and then get that money reimbursed but Shell will continue to be, as the landlord, responsible for the property. So that's the practical effect of not giving a lease back to the dealer. But following up on that point on whether or not the roofer is the same, we have the issue with regard to aid, for example, with this side agreement. That's a different issue. But it also goes to the same question of whether the roofer was the same roofer or not. I'm not asking you because I think you're right on that one. I'm going to ask your other side on that one. Maybe you want to argue to my colleagues because I don't know what they think. I'm happy to explain or clarify the issues to make them more crystallized, but I can wait for counsel to make her argument. Make your argument. I'll make my argument. Okay. What Shell did here was pretty devious. It seems Shell is trying to make it look like it's not a big deal, but it really is. The PMPA requires that a right of first refusal be given on the same terms as a third party offer. In this particular case, the echelon met with the third party and told the third party, okay, we want $2.1 million for this property, but if you agree to sign a brand covenant, and what that is is an agreement that requires that this station, it's a deed restriction is what it is, and it requires that this station will continue to be a Shell-branded station for the next 10, 20 years. With the right to buy gasoline at two cents over cost. That was part of it as well. That was part of the deal as well, but really what it is, we're saying that if you... And then there was a $300,000 consideration. A $300,000 discount, but... You got the discount. The third party would get the discount, but... And your client. My client was not offered the discount. So that makes a discrimination right then and there, doesn't it? Well, it means that my client is not getting the same offer as the third party. And Shell... He's not being told that he can get a $300,000 discount. Correct. That he has that option. That if he chose to continue on... Because once he buys the property, my client is free to brand Chevron, Exxon, whatever they want. But what's the economic difference? The economic difference is $300,000 plus a two-cent-per-gallon option that the third party has the option of accepting, but that my client did not have the option of accepting. Third party stuck with Shell, but gets a benefit of two cents over cost. Your client can sell any kind of gasoline, market anything, do any kind of discount, maybe make a better profit. Well, you have to... It's a similar deal. I understand what Your Honor is saying, but you have to take a step back. The third party is not required to buy Shell. The third party is given an option that if he wants a $300,000 discount on the price, he will have to agree to buy only Shell. At two cents over... At two cents over price. My client was not given the same option. He wasn't even told that there was an option. Is that your whole case? Well, that's part of the case for... If you win that, you win everything, don't you? With regard to A only, not with regard to Arms Walker. Okay. Because what Shell did here... We have to really understand what Shell did here. They went to the third party and they said, okay, we're giving you this option, but we're not giving you a discount on the price. The sale price is still going to be $2.1 million, but in escrow, if you sign the new supply agreement that binds you to be a Shell dealer, we will give you a credit in escrow. So it's not on paper. It's a side deal, and that's what makes it devious, and that's really the best word that comes to mind, is that they're doing it in a way that they're presenting the dealer, a roofer, saying, look, this is the same offer that a third party got, but they have the side letter, the side agreement that says you're going to get a credit. So that's an easier part of it. The last part really has to do with the standard for... I'm sorry, I've got to dry my mouth, but... Do you want to get some paper? Sure, please. Now, both parties relax a little bit. This case will schedule 10 minutes aside. There's enough complexity to it. We're not going to rush you through this. Both sides get to say what you need to say. I understand. Thank you, Your Honor. And there's a lot of information here. With regard to the standard for the reasonableness standard, and I think I've cited all the case law there really is to cite on where that comes from, but thinking about this practically, if a third party, let's say McDonald's, came in and said, we want to bid on this property, and Sheryl said, okay, you can bid on this property, but you have to do... I can't think of an example right now, but you can think of examples where you can have firms in a contract that would just be completely off the wall unreasonable in an extreme case. Now, here's a question I've got for you with respect to the aid contract and side deal. It seems to me that the deals offered to your client and the third party clearly are different. It's possible that economically your client might have turned it down because he might have wanted the freedom to buy gas from somebody else. Does it matter that I can't tell as I sit here what's more advantageous to your client, or does it just matter that these are actually quite different offers? The court should not be in a position of deciding of what's more advantageous or isn't. The PMPA is meant to be a very just... It's meant to be a very minimal black and white type of rule, but it ends up being a lot more complicated than that. So your client's the one who gets to decide which is more advantageous. Exactly, because it's a right of first refusal, which is exactly what it says it is. It's supposed to be the same offer as a third party. Now, Shell has come up with the argument that, well, later on after this lawsuit was started, we did say that this dealer could benefit in the same exact way if he chose to do so and accept it on these terms just like a third party did, but that's no longer... that required us to file this case, and that is not what this court is looking at. The court is looking at, at the time the offer was made, did it comply with the PMPA? Once the offer was made, though, in the same terms, why didn't you just say, okay, we'll settle, game's over, we dismiss? Well, because there was a lot more to it than that. I don't want to get into settlement discussions, but that is one of the options, actually, that my client has contemplated, is accepting with the $300,000. But then we have other issues with regard to deed restrictions and so forth. Plus, under the PMPA, we are entitled to recovery of attorney's fees for having to challenge the roofer in the first place if the roofer prevailed in parties. So there are issues that are beyond what's before the court right now. Now, going back to the reasonableness standard, if the court finds that, yes, there is a question in the legal terms as to whether an offer is reasonable or not, that is something that the court must also review, then I think we win this appeal because there's plenty of... A third party likes the deal, it's reasonable. You get an independent bid from a third party, that shows it's a reasonable deal. Well, not necessarily, because, again, given what our experts have said... with an independent motive to either take the deal and be interested in the deal or not. Well, we have the Slatke case, we have the Anand case, we have the Ellis case, and all those cases mention the fact that even in a roofer situation, you can have an offer that is laced with terms that are unreasonable for the franchisee, which is why we have the standard in the first place, because a third party making a bid is evaluating the bid from its own perspective and in its own way and in its own time frame. The dealer is giving this offer, and he has all of a sudden pulled into the PMPA, and he's required to respond within certain time frames. There are deadlines, and if he doesn't act, he will lose his right to buy that property, which could be a station that he's been operating for decades. And so it makes sense for there to be some minimal threshold of what is reasonable and what is not. And if the question is whether or not an offer has reasonable or unreasonable terms, then by its own definition, it's a question of fact for the trier of fact to decide what is reasonable and what isn't under all of the evidence and the circumstances of the case. And in this particular situation, the lower court simply brushed that aside and said, reasonableness is not the standard, and that was the end of the analysis. And I don't believe that's where the analysis ends. The court was required to at least go one step further and say reasonable is a standard. Maybe it's a minimal standard. The court may have given it a lower view or not hold the reasonable standard as high regard and say, well, there's not enough here in the evidence to show that it is or isn't reasonable. But that's not what happened here. The lower court simply said reasonableness is not the standard, and that was the end. But clearly there's evidence here that goes against the argument that these offers were reasonable. Why don't we hear from the other side, and then we'll give you a chance to respond. Thank you. May it please the Court. My name is Robin Watford. I represent Epelon Enterprises, LLC. The first thing I'd like to address with this Court is the appellant's obvious attempts to complicate a federal statute that only required Epelon to do three things, and which the trial court properly found Epelon did. And those three things were to make the decision to sell in good faith in the normal course, give the notice of 90 days non-renewal, and three, to either make a bona fide offer or a right of first refusal. At the heart of this dispute is the PMPA, a statute which was created by Congress in 1978 to address the unequal bargaining power between oil companies and dealers. And what the PMPA was created to do, while they wanted to address the unequal bargaining power, they also recognized Congress did not wish to interfere with the interest of the franchisor, who is, after all, the owner of a property. Can we get down to brass tacks? Yes, sir, Your Honor. Your Honor, can you tell me why the offer to aid, that is to say, the case where the third party got an offer of a side deal, can you tell me why the offer to aid was the equivalent, that is to say, right of first refusal within the meaning of the statute? Because I'm inclined to think that it's not. Your Honor, it was equivalent because the Hans did not agree, at the time they agreed to purchase the property, to enter into a supply contract. That's what the evidence reflects. They were not willing to do so. They were not willing to make it a term of the contract. Like in Arms Walker, the buyers were willing to make it a term of the contract. But the offer is, we'll sell you this at a certain price, and at closing, and as a condition of closing, we will give you the following offer, that is to say, we'll offer you a $300,000 discount on the price. You agree that you'll take Shell-branded gasoline and we'll sell it to you at $0.02 over cost. That was an offer. That was an offer. It was not accepted by the Hans. It was not a written contract, Your Honor. And it was not something we could require the dealer in this instance to agree to. But you're not, but right of first refusal doesn't mean you can require. It means you have to offer. And you didn't offer it to him. But it was, Your Honor, we did not offer it to him in the third party. It was not part of the third party offer that we used to make the right of first refusal. We later did make them that offer. But we're not required to. But assume that Mr. Aide turned down the offer that was given him, and you go forward with the third party. And at closing, the third party says, you know, I think that's a pretty good deal. I'll take the $300,000 discount. I'll agree to sell Shell-branded gasoline, and I will take it at $0.02 over cost per gallon. And Mr. Aide says, well, wait a minute. I would have accepted that deal in a heartbeat. I don't get it how you can say that you complied with the statute. Well, Your Honor, because the statute only requires us to offer what the third party agreed to already, which was what the terms of the third party offer attached to the offer. But my hypothetical is, in fact, I think it's a perfectly plausible hypothetical, that that's exactly what the third party agreed to before he signed the contract. It's just you have it in two stages, and by the time he finally agrees to what the actual offer was, you say, oh, too bad. You can't do it. I don't get it. But, Your Honor, we did make that offer to Aide, and they didn't accept it. They continued with this lawsuit. Wait a minute. You're talking about you making the offer later? Yes. Yeah, but that's not, sorry, you don't get to do that on the facts I'm dealing with. You had to make it within the time frame of the statute, and you didn't. So the question is, is the offer that you made within the time frame of the statute equivalent? Not whether you made that same offer later. Your Honor, because there's nothing in the record that showed the Hans had agreed to the supply contract, I would say to you that we did comply with the strict terms of the ROFR requirements. Even if it's going to play out at closing with the third party, they say, yes, please, I'll take the $300,000 discount, and I'll agree to the branded gasoline and the two cents, and that's the contract that's signed. You say that you've complied because you've given that offer to Aide? I don't get it. Your Honor, it was not an obligation. The obligation to the dealer was to offer them the opportunity to purchase their interest in the property. On the same terms as offered to the third party? I understand it, but the record does not reflect that the Hans agreed to those same terms. It doesn't make any difference. It's the offer to the Hans, not the agreement. The right of first refusal speaks to the offer that has to be matched. If I give one offer to Mr. Lebedev and another offer to you, and you have a right of first refusal, does it make any difference what Mr. Lebedev does? It's the offer that counts. But the offer that we made to Aide is the offer the Hans agreed to. There was nothing more. There was no contractual agreement between Aide and the Hans. But the offer to Hans was somewhat different, wasn't it? Ultimately, the acceptance differed from the offer. There's an offer and counteroffer and then an acceptance. But the first offer, the offer you gave... The first offer we gave to the Hans was we would like you to enter into supply, and they said no. And we said, okay, what will you purchase the property for? And they made their offer to purchase the property without supply. That's what we then turned around and offered to Aide. We had nothing more to offer Aide at that time. So I think we did comply. And in the... Different question. Yes, Your Honor. The record shows that both Arms Walker and Aide accepted under protest. Yes, Your Honor. What should we make of that? You should make that they rejected, they wrote for, and we should be able to close with the third-party buyers. What does it mean to accept under protest? It means they haven't accepted the terms of the contract. They've actually rejected it. Huh? I don't get it. They say accept. Under protest might mean, and I'm going to bring a lawsuit, but I've accepted the offer. Well, they've brought the lawsuit and asked you to change the terms of the contract. I don't think that's an acceptance. First they brought the lawsuit. Yes, Your Honor. They claim that when they brought the lawsuit, their deal was not the same as the deal offered to the third parties. And then their allegation is that you sweetened the deal to the existing licensee, franchisees, to make it the same. And then they accepted under protest. No, they accepted the offers before we changed any terms, Your Honor. Okay, then I'm confused. At least that's what the record reflects. What was changed after they accepted the offer was we withdrew the release language and the mutual termination. That was amended, and that was amended within the 90 days. And that was for both dealers. But they didn't get 45 days after that, did they? They could have had it. They didn't need it. They were ready to accept. They got a beneficial term given to them. Nothing else changed. There's nothing in the record to indicate that they're disputing the 90 days notice. That beneficial term that you just mentioned was a sweetening of the offer to the franchisees, wasn't it? It was withdrawing a release provision and a mutual termination. Which was the dissimilar aspect of the two deals, the one you offered to the third party and the one you offered to the franchisee. And then you sweetened the deal to the franchisee to be the same. Your Honor, we didn't sweeten the deal. The mutual termination agreement could not have been offered to a third party buyer because they didn't have a lease agreement with Equilon. It's a different term. The parties come to the table with different hands. Buyers come to the table with different hands. And this Court itself has recognized the terms of the ROFRs do not have to be exact because they can't be exact in all situations. For example, in BP v. May, this Court held that not offering the supply contract that was offered to the third party dealer and made optional to the buyer didn't make it not a proper ROFR. In Bedresia v. Equilon, which is a Central District Court case, the deposit that was required of the dealer versus deposit to the third party buyer was different. The Court said that didn't make it an improper ROFR. Some of the terms can't be exactly the same. That doesn't make it an invalid ROFR. I'd like to address this issue. The statute says that you have to offer the franchisee a right of first refusal of at least 45 days duration of an offer made by another to purchase such franchisor's interest in such premises. So the simplest thing is you take the offer made by the third party, you give it to the franchisee and say match it or beat it, you have 45 days. That's exactly what we did. That's what you did? Okay. And the only thing that changed is the parties objected to the release language in the mutual termination agreement and that was removed within the 90 days that was required. You know, I'm puzzled here. Just lead me through the aid transaction there because you tell me that's exactly what you did. So tell me what you did. We put the property on the market through C.B. Richard Ellis. We got several bids for the property. The Hans came in and made a bid. We accepted their bid. They were not willing to enter into a supply contract so it was not part of the third party offer. We then took the third party offer. We attached it to our right of first refusal notice and we offered it to aid. And when does the side agreement get entered into and what are its terms? The side agreement was never entered into, Your Honor. It was discussed with the Hans that we would be willing to do that if they wanted to enter into a supply but at the time they were unwilling to enter. You should say when was the side offer made by you and what were its terms? When was the side offer made by Equilon to the Hans? It was made prior to the Hans signing the third party offer. Yeah. They didn't accept it. But that's not part of the contract. The statute says you're supposed to offer to the franchisee the same thing you offer to the third party. Yeah, I think what Ms. Wofford is saying is that the Hans offer did not include that other option and therefore the only thing that she was obligated to give to the franchisee was the offer made by Hans. Is that your position? That's exactly what I'm saying. They weren't willing to agree to enter into a supply agreement. So Ms. Wofford is saying it's irrelevant what Equilon may have offered to Hans. The only thing that's relevant is what Hans offered to buy for. Yeah, but as I understand the statute, it's not what the third party offers you. It's what you offer the third party. The statute reads on terms the third party made to purchase your interest in the premises. I got it. Okay. And that's what we offered, Your Honor, the terms the third party agreed to. Now I'd like to go to the issue of commercial reasonableness. If there's any inclination of this Court to change the standards for a statute that's been in place for over 30 years. Commercial reasonableness is not a standard that Congress put into the PMPA. And there are two options that were given to Equilon in order to make this offer. They could have made a bona fide offer or they could have made a right of first refusal. The right of first refusal by its very terms is reasonable because a third party, they've negotiated at arm's length with a third party. And in fact, Your Honor, in Alice v. Mobile Oil, where this Court was dealing with the BFO but recognized the difference between a BFO and a roofer and stated, when a third party's offer is in the form of a single transaction for cash, the Court can justifiably infer that the amount of an arm's length offer represents the value of the station. On such facts, all a franchisee is entitled to is a right of first refusal. That's exactly what we have here in both cases. A third party offer in the form of a single transaction for cash, and the Court should not infer that it should be given leeway to question every term in a roofer to determine if it's reasonable. So we do not believe that standard applies at all. When Hahn made its offer, did Hahn believe that it would receive a $300,000 credit? I can't answer that. According to the testimony. I do not believe the testimony answers that, Your Honor. The Hahns knew that that was an agreement they might be able to get, but I don't know if they believed they'd receive it. There's nothing in the record that... If they decided that they would remain as a shell station, they would get $300,000, and that was belatedly offered to the franchisee. That is correct. Same amount. That is correct. Without a 45-day requirement after that. Your Honor, the Hahns had the choice just like the dealers had the choice. Once they purchased the property, to ask to be shell suppliers or to go out on the market and try to cut a better deal with another oil company, which most of these people do. But the franchisee was not offered $300,000. No, because it was not a term that had been reached with a third-party buyer at the time. That's not what the third-party buyer offered to buy from us at the time. Did the court below find that it was offered? The court did not make such a ruling, Your Honor. The court actually said it was a contract that had never been entered into. It wasn't a binding agreement. Well, because the deal was a... All right. Thank you. So review the evidence for me with respect to the side deal or side offer with respect to the Hahns. At what point do we get the correspondence that sets this up as a possibility? You mean the dates, Your Honor? I will have to say I don't know those off the top of my head. How about the sequence, if not the dates? The sequence of events, as I understand them, is that the properties were out for market. Shell wanted a supply. The Hahns said no. They made an offer to purchase the land, improvements, and equipment. That is to say the Hahns made the offer. The Hahns made the offer to purchase the land, improvements, and equipment. After their offer was made, there was discussions about if you want to enter into supply at closing, we'll give you a discount. There was never a written agreement. There was never any escrow amendments. None of that's in the record. And was there a written offer in acceptance prior to closing that we can look at? A written offer in acceptance? Yes, it's the third-party offer. So it's a written offer in acceptance binding on you that you had to accept? From the Hahns. Yes, it's a third-party offer attached to the ROFR. That's what we're all bound by. Okay. And the question of fact is whether there was a $300,000 benefit also offered to Hahn upon closing. I do not believe that's a question of fact because all we were required to do under the statute is offer the third-party offer on the same terms the third-party offered to purchase from us. We had to offer it to the dealer. So there is no question of fact. Was there any discussion before the acceptance of the Hahn offer by your client of this site? I'll call it an arrangement, so to stay away from the term offer and deal, but was there any discussion of that before that contract was entered into? Between the Hahns and Equilon? Not in the record, Your Honor. The Hahns made their offer and then there was discussions. That's my understanding of the record. If I'm wrong, I'll stand corrected. Okay. I guess I might be able to find out. Okay. Okay. Thank you, Your Honor. May it please the Court. I believe I can help answer some of those questions. How about the one about was there any discussion before the contract was entered into between the Hahns and Equilon? Definitely there was. It's on the record to tell us that. Yes. We have a declaration from Mr. Hahn. It's in the record on page, Excerpt of Record 1079. 1079. Okay. And in Paragraph 3 he says that he's been a shell dealer for over 20 years. And in Paragraph 6 he says, Because I have always been a loyal shell dealer, I fully intended to buy the station as a shell-branded station and had no problem agreeing to these conditions if it would save me $300,000 on the purchase price. Yes, but that's not my question. My question is when did this discussion about the $300,000 take place? July 2009. Do you know that how? Well, it's in Mr. Hahn's declaration that I just read from, and it is also in the deposition of David Burrow. And when was the contract signed between Hahn and Equilon? We can look at the actual ROFR because the contract is the ROFR, but the Notice of Non-Renewal telling... I don't want the Notice of Non-Renewal. I want the date the contract was signed between Hahn and Equilon. Well, the contract was signed before the Notice of Non-Renewal. And the Notice of Non-Renewal was September 8, 2009. So between July and September is when these discussions took place with the Hahn's and a contract was signed. And then the ROFR was provided to my clients on September 15. From that declaration, the offer of $300,000 discount would seem to come before the commitment of Hahn. He testifies, because I've always been a loyal Shell dealer, I fully intended to buy the station as a Shell-branded station and had no problem agreeing to those conditions if it would save me $300,000 on the purchase price. That's what I just read from Craig. Yes, so it suggests that the conversations were rival-simultaneous with the execution by the Hahn's... The Hahn's were fully aware... Exactly, the Hahn's were fully aware that they would get this credit in escrow. And specifically, if you look at Mr. Burrow's deposition, he actually says that it was supposed to be not a reduction in the purchase price, but a credit in escrow. And because it couldn't be a reduction in the purchase price, otherwise it would have to be in the ROFR. And it wasn't in the ROFR, and that's the whole point, is that it should have been. And the actual... The ROFR never put in the escrow? No, it never materialized at that point. But the issue... One thing to remember is that, you know, we're talking about this as an offer and an acceptance, but really what it is, it's Shell Oil Company deciding that they're going to divest certain properties, they're going to sell them off, and they have internal discussions that go up to the highest levels of management that first decide on what is the revenue that we want to get from this divestment. But the only obligation is to give the franchisee the same deal that the Hahn's agreed to, the Hahn's offer. And the Hahn's offer in writing had nothing to do with $300,000 discount. That was... That was a side deal. But what I want to make... Never in writing, never reduced to writing, and perhaps never binding. Well, there are writings. And the main writing, this is what I'm referring to, is in the record on page 215 through 218, that is a group divestment proposal. And what that is, that is an internal Shell memo. This is how Shell decides. They have a separate group divestment proposal for each property that is going to be divested. And that memo talks about the potential buyer, which is Hahn in this particular case. It doesn't mention him by name, but it's talking about this is the offer we received. And it talks about all the financials. In other words, if we sell this property at this price, how much are we going to recoup? What is going to be our profit, our gain? And so the highest level of management at Shell approves this divestment proposal and agrees that this is the price we want to sell it for. So in any kind of... What's the amount? It's... Is it 2.1 or 1.8? It's both. Because it's talking about the $300,000 credit in escrow, which is approved by the highest level of Shell management. This is why this isn't just something that Shell is doing on a whim. This is something that they've worked out in their own financials. And it says the request to approve Shell's interest in the sites at 400 North Alvarado, Los Angeles, California, to a third party for $1.8 million with a 10-year supply agreement and 20-year brand covenant or to sell to a third party for $2.1 million unrestricted or to the current operator as a roofer. What page of the record are you reading from? 217. ER 217? ER 217. Okay. And this is the last page of the group divestment proposal that was approved by Shell's management, which is explained in David Burrow's deposition. And what's the date of that document? It doesn't have a date. There's a date that says February 5, 2010, but I think that's the date it was printed, not the date it was actually made. But the point is that this was done before it was approved that Han, before the roofer was signed by Han. Okay. So we can tell from internal evidence that that's so? From the deposition of David Burrow. Essentially, Shell approved this before it entered into the purchase and sale agreement with the Hans. I got it. On Mr. Burrow's deposition, which is on... We see, when we look at the record, that your client did other than block the sale that would have consummated, except for your client's actions. That Han, if my client had not accepted the offer under protest, then the Hans would have been free to close escrow. And so by accepting the offer under protest, we are saying that we want to buy this property, but we want to do it according to whatever the law mandates, whatever the PMPA requires. But under different terms. On terms that comply with the law, because we're challenging the sufficiency of this roofer under the PMPA. And if you look at Mr. Burrow's deposition, which is ER... You really want to vitiate the whole third-party arrangement. You want to be the franchisee in place without having to enter into any kind of contract, don't you? I think my client, honestly, I think my client would buy this station with this $300,000 discount because it's a significant amount of money. And in today's lending environment, I believe that it would, for financing purposes, I think... But when we look at the record, how do we see that? You really don't, because it's irrelevant what they would have done. We're analyzing the roofer itself, and does it comply with the law? You would go home today and make this deal, taking the $300,000 benefit, and that would be the end of it? Essentially. Well, we're also fighting about the deed restrictions. I mean, those are important because they affect the value of the property. When you're talking about restricting the property to only commercial use... I don't want to be putting words in your mouth, and I may be wrong about this one, but it strikes me that if you were to persuade us of the correctness of your position with respect to the aid case, not the other one, Arms Walker, you'd just start over. That is to say, it's an invalid deal, and if Shell wants to buy you out, okay, here we go again. We just start over. I don't think there's an offer still on the table. Well, it's one of two things. The offer has been accepted, and so the question is that what we're asking for the court to do is really reform the offer to make it comply with the law, and it's very easy to do because we're not asking the court to add anything to the offer. We're simply asking the court to strike provisions that we believe are not appropriate under the PMPA and under the prevailing case law. So it's not necessarily that there has to be a new offer made because there has been an offer made. The offer purported to be made pursuant to the law. The offer was accepted, and so the court is in a position to reform the offer to say that it needs to be like this. Are the deed restrictions in the offer? Excuse me? Are the deed restrictions in the offer? Correct. And they were in the Hahn proposal as well? Yes. So how are you entitled to a deed restriction? Because we are... You accept under protest. You accepted the restrictions on the deed. But we are accepting under protest looking to the PMPA for guidance as to whether these types of restrictions are reasonable or unreasonable, and we as an existing franchisee have protections under the PMPA. The third party doesn't. So everything needs to be looked at through the eyeglass of the PMPA when reviewing the ROFR that was provided to the dealer. And so that's what we're dealing with. And when an oil company is offering, for example, they're selling you the underground storage tanks because under the PMPA they're required to offer their interest in the property, and that's part of their interest. And so they're offering you the storage tanks, but they're saying you have to have environmental insurance for these tanks. Well, that's reasonable. I mean, I'm not arguing that having insurance is not reasonable, but part of that is that if you don't pay your premiums, it says we can have our own insurance, we can pay the premiums for you, we can sue you for the money, we can get injunctive relief, and we can also enter your property and remove the underground storage tanks. And there's a reason for it, and you know what the reason is. The reason is because they don't want to be held liable for it. That's right. Correct. They're going to be held liable... Correct. ...because they put the tanks in the ground. But that liability is covered by the insurance requirement, which is in there as well, and it's also covered by injunctive relief provisions. But to say that we have the right to go in and simply remove the tanks based on our own decision that you're not complying with the insurance requirement, you're retaining a portion of your interest in those tanks. And that's why we're arguing that they're not conveying their entire interest. They're retaining what they will be held liable for, and no more. Isn't that right? Well, not no, more than that. Because what they're going to be held liable for is something that can be covered with environmental insurance, which is part of the agreement. Not necessarily. I mean, the liability for tank leakage can be absolutely horrific and may be covered by insurance, even if you've got insurance. And it does not strike me as unreasonable that Shell should want the right to go in and take them out if that's going to be an appropriate thing to do. Actually, we were arguing it's unreasonable, but there's no cut to that. It's not just that it's unreasonable. It's that Shell is not offering its interest in those tanks by saying we have the right to remove them, and that's the PMPA argument. I think we've got it. Thank you. Okay. Thank you, Your Honors. Tricky case. Thank you very much. Armis Walker v. Equilon. But it's not unusual. Is it? Nothing unusual. Not unusual. Not unusual. You are welcome to identify yourself. Yes. I've...
judges: Hellerstein, Farris, Fletcher